**STATE of Missouri, Respondent,**

v.

**Timothy JOHNSTON, Appellant.**

No. 74064.

Supreme Court of Missouri,
En Banc.

Nov. 25, 1997.

As Modified on Denial of Rehearing
Dec. 23, 1997.

Melinda K. Pendergraph, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., David R. Truman, Asst. Atty. Gen., Jefferson City, for Respondent.

ROBERTSON, Judge.

A jury convicted Timothy Johnston of first degree murder after he beat his wife to death. Upon the jury's recommendation, the trial court sentenced Johnston to death. Johnston filed a timely Rule 29.15 motion, which the motion court overruled. Johnston appealed the conviction and sentence and the motion court's ruling. Among the numerous substantive and procedural issues he raises, Johnston claims that evidence produced by a search and seizure in violation of the Fourth Amendment tainted his confession and that the state failed to prove that he deliberated prior to killing Nancy Johnston. We have jurisdiction. Mo. CONST. ART. V, SEC. 3. The judgments are affirmed.

**I.**

We review the facts in the light most favorable to the verdict. *State v. Copeland,* 928 S.W.2d 828, 834(Mo.), *cert denied,* —— U.S. ——, 117 S.Ct. 981, 136 L.Ed.2d 864 (1996).

At 2:28 a.m., June 30, 1989, paramedics arrived at the home of Timothy and Nancy Johnston in response to a 911 call seeking assistance for a "severe sick case." The 911 operator also dispatched Officer Matthew Rodden of the St. Louis Police Department to the residence. Officer Rodden arrived at the Johnston residence at the same time as the ambulance carrying the paramedics. A male voice from inside the house directed these emergency personnel to "hurry up, inside. She is in here. She needs help." The officer and the paramedics stepped over the bloody sidewalk and porch into the house.

Just inside the doorway, in the living room, they found Timothy Johnston bent over a woman lying on the floor, her otherwise nude upper body draped with a shirt, her face and torso horribly injured, swollen and bloody. A six-inch gash ran across her forehead to the socket of her right eye. Someone had

yanked large patches of hair from her head. She did not breathe. Officer Rodden had to remove Johnston before paramedics could assess the woman's condition.

Paramedics declared her dead at the scene. An autopsy performed later that morning revealed extensive, blunt-trauma injuries over much of her upper body; a broken nose; bruised and torn lips; scrapes to the back of her head and on her face; separation of a portion of the scalp from the skull; a broken right collarbone; a four-inch tear in her liver; bruising and tearing in the heart and spleen; breaks in nearly all of her front ribs and in four of the back ribs; and a variety of relatively "minor" scrapes and bruises over much of her body. The medical examiner determined the cause of death as the collapse of the support structure around the heart and lungs, rendering those organs unable to function because they could not bear the weight of the muscle, tissue and bone pressing on them. Bleeding under the skin confirmed that the victim had remained alive through most of the beating.

A purse near the victim yielded the identification necessary to confirm that Nancy Johnston had died.

When informed that his wife was dead, Timothy Johnston flew into a rage, throwing himself against the walls of the living room, knocking lamps and small items from their places and overturning furniture. He ordered the officer and the paramedics to leave his house, screamed that he knew that a motorcycle gang that wanted "to get back at him" had killed his wife and said that he would take care of everything that needed to be done.

Now at an obvious murder scene, the officer, of course, did not leave. Indeed, by this time, other officers had responded to the Johnston residence. One of those officers, Officer John Ruzicka, had seen Timothy Johnston earlier in the evening when he had responded to a call reporting an assault in progress at the intersection of South Broadway and Eichelberger. When he had arrived at that location at approximately 1:30 a.m., Officer Ruzicka had discovered a dark-colored, two-door car stopped in the middle of the southbound lanes of Broadway. Ruzicka approached the car, noted the broken wind-

shield on the driver's side and told the driver to "hold on a minute." The driver ignored him and sped off. Ruzicka gave chase briefly, but returned to the place of the assault to interview witnesses.

Marty Bounds, one of those witnesses, had stopped when he saw a car abandoned in the middle of Broadway and noticed a man "beating on someone" on the sidewalk next to a house. He could not determine the gender of the person being beaten until the attacker ripped her shirt from her. The attacker kicked the victim "like if you would kick a football, stomping like ... a tin can, if I was trying to flatten it." Bounds tried to interrupt the attack verbally, but the attacker responded only with profanity. Bounds drove his truck toward the attacker in an attempt to break off the beating and, when this had no effect, Bounds drove his truck in circles in an attempt to attract enough attention that someone would call the police.

Naomi Runtz awoke to the sound of a fracas outside her window. She saw a man kicking and stomping someone and called 911. Streetlights illuminated the scene sufficiently well so that Bounds, Runtz and Officer Ruzicka later identified the attacker/driver as Timothy Johnston.

Johnston apparently remembered Officer Ruzicka from their previous encounter. When Ruzicka arrived at the murder scene, Johnston renewed his vulgar demands that the officers leave. The officers decided to handcuff Johnston and take him to a police car to protect the officers, the crime scene and Johnston himself. Johnston began kicking the inside of the car. Detective James Maier, who had just arrived, saw Johnston's flailing and ordered Johnston removed from the car in an attempt to calm Johnston. Maier noticed blood and hair on Johnston's steel-toed motorcycle boots. When Johnston did not calm down, Maier directed other officers to take Johnston to the police station.

Officers on the scene learned that a third person, Michael Federhofer, Nancy Johnston's eleven-year-old stepson, also lived in the house. They checked the house to see whether Federhofer was also a victim and to determine whether any members of the motorcycle gang to which Timothy Johnston had

referred remained in the house. In that process the officers discovered evidence that will be discussed more fully at point III, following.

After reviewing the crime scene, Detective Maier returned to the police station. He informed Johnston of his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Maier told Johnston that he, Maier, believed Johnston was involved in the murder. Johnston denied involvement but became severely agitated. Maier left Johnston alone for nearly an hour. When he returned Johnston told a story that members of the rival motorcycle gang had dumped his wife's badly-beaten body on the driveway. He brought her into the house and called 911. She died before help could arrive.

Maier told Johnston that eyewitness accounts differed substantially from the story Johnston told. Johnston began to cry. After a short delay in the interrogation while technicians took fingernail scrapings from Johnston, Johnston called his wife a "whore" and indicated that he had grown tired of her infidelities. Johnston also said that he was "dead meat" and told Maier he would confess.

Johnston recounted that he and Nancy had gone to a local bar on his motorcycle before midnight, that they had had an argument at a bar, that he had left her there and returned to their residence. He claimed that he called several friends on the telephone, hoping, he said, that they would help him calm down. Still angry after his friends failed him, he grabbed a revolver and shot up the house and a television. Nancy came home in the midst of this tirade and attempted to drive away in her mother's car, which was parked in the driveway. Johnston ran out and jumped on the hood of her car as his wife tried to drive away. On Broadway, she stopped the car after he had kicked in the windshield and tried to run away. Johnston chased her, knocked her to the ground, and punched her a few times. According to Johnston, he and Nancy decided to return home, but the argument resumed once they arrived there. He resumed hitting and kicking her. He took her inside and called 911.

The police found the stepson, Michael Federhofer, the next day in the company of his grandmother. He confirmed parts of Johnston's story, but added that he saw Johnston hitting his stepmother while she was still in the car when the two returned home. Johnston saw Federhofer on the porch and ordered the boy to help him get Nancy into the house. Federhofer told Johnston to "leave her alone." Johnston told Federhofer to "shut up or I'll kill you" and moved toward the boy. Federhofer ran away. He spent the night with his grandmother.

A neighbor, Robyn Romanchuk, told police that she saw a man standing over a woman, kicking her repeatedly and calling her a "slut," "bitch" and "whore." She heard young Federhofer, whom she knew because he played with her son, scream and saw him run away. She recognized the voice as that of the man who lived with Nancy Johnston. She watched as the man continued kicking the woman. She saw the man drag the woman behind some bushes. She saw him beating her with a lawn chair. She saw him go into the house, leaving the woman lying outside, and return carrying a new, unidentified weapon with which he hit the still body repeatedly. She saw him drag the body over the porch and into the house.

On the strength of this and other evidence that we will discuss as it relates to Johnston's legal points on appeal, the jury found Johnston guilty of first degree murder and recommended the death sentence because the murder of Nancy Johnston involved torture and depravity of mind and was, as a result, outrageously and wantonly vile, horrible and inhuman. The trial court sentenced Johnston to die. This appeal followed.

## II.

In death penalty appeals we are continually faced with claims of plain error and motion court error that are without merit on their face. For this reason, we will not address neither claims of motion-court error founded on alleged trial court errors that Johnston should have preserved for direct appeal. *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995). Nor will we review motion court error or trial court error for plain error

under Rule 30.20 unless a claim of plain error facially establishes substantial grounds for believing that "manifest injustice or miscarriage of justice" has resulted. *Id.* We will consider related claims of ineffective assistance of counsel for failure to preserve alleged trial error through application of the familiar test found in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): counsel is ineffective only if trial counsel's performance fell below an objective standard of reasonable competence *and* trial counsel's ineffective performance created a reasonable probability that, but for trial counsel's ineffective performance, the outcome of the guilt or penalty phase would have been different.

### III.

### *Suppression of Physical Evidence*

■ Johnston claims law enforcement officials violated his Fourth Amendment right to be free of unreasonable searches and seizures when they recovered evidence without benefit of a warrant contemporaneously with and subsequent to the discovery and removal of Nancy Johnston's body. Johnston asserts that police used this "illegally seized" evidence to obtain Johnston's subsequent confession and that the trial court erred in refusing to suppress both the evidence and the confession.

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects against *unreasonable* searches and seizures shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV (1791). (Emphasis added.)

### A.

When considering a warrantless search and seizure, the analysis of its "reasonableness" begins—but certainly does not end—with the inquiry whether the police are lawfully in the place from which they seize the evidence. This inquiry focuses on the whether the defendant harbored a reasonable expectation of privacy from the roving eyes and seizing hands of the police at the location in which the alleged Fourth Amendment violation takes place.

■ After beating his wife to death, Timothy Johnston called 911 requesting emergency medical help for a "severe sick case." Emergency medical and law enforcement personnel arrived at the Johnston residence simultaneously and heard Johnston calling "hurry up, inside, she is in here, she needs help." Entry of a residence upon consent of a resident in charge of the home is lawful. *State v. Ferguson*, 624 S.W.2d 840 (Mo.1981). We conclude initially, therefore, that Officer Rodden's presence in the house was the product of Johnston's invitation.

Officer Rodden discovered a dead body in the house. This transformed the dwelling into a crime scene that permitted the police, who had authority to be in the house as a result of Johnston's invitation to Rodden to conduct a cursory check of the house for other victims, to determine the presence of any of the persons that Johnston claimed were responsible for the murder and to protect themselves from Johnston or others who might seek to do them harm. Whether evidence seized without a warrant must be excluded under *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), is a function of whether these exigent circumstances—which effectively extend the area in which police may lawfully be—render the *search and seizure reasonable within the* meaning of the Fourth Amendment.

### *Plain View*

The plain-view exception to the warrant requirement expresses the Fourth Amendment's conviction that a person's reasonable expectation of privacy diminishes as to items that are readily visible in an otherwise private location into which police are invited or a public location to which all have access. Under this exception, an officer who is lawfully located in a place from which the object can plainly be seen may seize the object so long as there is probable cause to believe that the object is connected to the crime. *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). Probable cause

exists where the apparently incriminating character of the item is obvious. *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990).

Johnston filed a broad, undifferentiated motion to suppress all evidence seized in and around the Johnston residence. Johnston claims the trial court erred in overruling his motion to suppress evidence the state justifies as "plain view" evidence.

Johnston relies heavily on *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). That case addressed "only the scope of the primary search itself, and was not overruling by implication the many cases acknowledging that the 'plain view' doctrine can legitimate action beyond that scope." *Arizona v. Hicks,* 480 U.S. at 321, 107 S.Ct. at 1151–52 (1987). Nevertheless, Johnston argues that, under *Mincey,* the police were not entitled to make a search of his residence's death scene. We note, however, "[i]t is difficult to imagine a worse set of facts upon which to rest an argument for a death scene exception to the warrant requirement [than *Mincey* ]." 3 Wayne R. LaFave, SEARCH AND SEIZURE, sec. 6.5(e), 383 (3d ed.1996).

In *Mincey,* several officers entered an apartment where a drug sale had been arranged. One officer charged into a bedroom and gunshots were exchanged. The officer was hit, and later died. The only other person in the bedroom where the shots were fired was Mincey. Roughly ten minutes after the shoot-out, homicide detectives took over the scene. The detectives remained at the apartment for four days, inspecting every item in the apartment thoroughly and seizing several hundred items of evidence. The case rose to the Arizona Supreme Court, which upheld the search under a "murder scene exception." A unanimous United States Supreme Court reversed.

Other than the fact that someone was murdered, the *Mincey* case is factually distinguishable from this case on nearly every facet. In *Mincey,* the police knew the homicide was criminal and knew who did it— Mincey was the only person in the bedroom where the shots were exchanged. Here, Johnston claimed that the brutal beating of his wife was inflicted by a rival motorcycle

gang. This claim raises the possibility of danger to police from other potential suspects, each of whom is unaccounted for and potentially fleeing the scene, destroying evidence or secreted in the residence posing a threat of attack. This exigent circumstance was not present in *Mincey.* The *Mincey* search lasted four days. This search extended for two hours from the 911 call. *Mincey* does not apply to Johnston's case.

We turn now to the specific items of evidence in this case.

The bloody washcloth found in the bathroom sink, the dented pipe, blood, hair and glass samples taken from the car, blood and hair samples taken from the porch and house, the lawn chair taken from the front yard, bloody, leather gloves found on the living room floor near the body, and blood and hair samples from the South Broadway at Eichelberger location were in plain view in areas where the police were lawfully present, where Johnston invited police or where the police had authority to enter because of exigent circumstances. Under these facts, law enforcement officers had probable cause to seize each of these items of evidence, and they are admissible as the product of a reasonable search and seizure.

Several other seized items require further discussion.

### The Pistol

■ Testimony at trial indicated that police found a pistol protruding from the wires behind the television set. The grip of the pistol was easily seen along the wall with a downward glance as one entered the front door of the residence. Nothing had to be moved to see the pistol or to retrieve it.

Nancy Johnston was so severely beaten that the cause of her death could not be determined by the officers on the scene. Given the massive quantities of blood, both in and around the house, she could well have been shot—though a later autopsy showed she was not. Since the pistol was within the plain view of the police and because they did not know whether it was used in commission of the crime, its apparently incriminating character was immediately apparent. The

trial court did not err in refusing to suppress the pistol nor in admitting the pistol. The pistol corroborated Federhofer's testimony as well as police descriptions of the murder scene.

### The Rifle

■ Police seized a .22 caliber rifle with a freshly-broken wooden stock from under the living room sofa. Officer Rodden, who did only a "visual observation," testified that he noticed broken pieces of wood, in plain view. From the record it is clear, however, that the broken stock itself and the remaining parts of the rifle were not visible. Seizure of the rifle and the broken stock violated the Fourth Amendment. *Arizona v. Hicks*, 480 U.S. at 324, 107 S.Ct. at 1152. The trial court erred in failing to sustain Johnston's motion to suppress the rifle and stock and in overruling Johnston's objection to the admission of this evidence at trial.

### The Shotgun

■ Shortly after arriving on the scene, the police learned that a young child also lived in the home. Given Johnston's agitated state, Johnston's claim that motorcycle gang members had killed his wife, and the mayhem in the house, Johnston's statement that the boy had run off could not reasonably conclude the inquiry as to the boy's whereabouts. The possibility of another victim or perpetrators in a house are sufficient exigencies to permit the police to undertake a cursory search of those places in the dwelling in which a body may be found or persons may hide. *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). In the course of the search for Federhofer and to protect themselves from the possibility of hidden perpetrators, police opened a closet in Federhofer's room. Police seized the shot-gun that was in plain view in the closet. Given the uncertain cause of Nancy Johnston's death, the shotgun was apparently incriminating. The police properly seized the shotgun—but it was error for the trial court to admit it into evidence at trial (*see* section VI A 2).

### The Bloody Jeans

■ Police found and seized a bloody pair of jeans hidden under Federhofer's bed. This discovery occurred only after police moved the bed. The jeans could not be seen without moving the bed. *Arizona v. Hicks* holds that moving an item to discover its serial number constitutes a search, even if the item is otherwise in plain view, if there is no probable cause to believe that the item relates to a crime. The cursory search the Fourth Amendment permits under these circumstances does not authorize the police to rely on the plain-view exception to move items of furniture.[1] Moving this bed is not reasonable under either a plain-view or protective-sweep analysis. The trial court erred in failing to suppress the bloody jeans.

### B.

■ Trial court error does not require reversal unless there is a reasonable probability that the trial court's error affected the outcome of the trial. *State v. Cook*, 628 S.W.2d 657 (Mo. banc 1982). Otherwise, the error not prejudicial.

■ The state introduced the broken rifle as one of the weapons Johnston used to beat his wife. The evidence revealed that Johnston also used his steel-toed boots, as Bounds testified, to kick her "like a football, stomping like ... a tin can, if I was trying to flatten it." Naomi Runtz saw Johnston kick-

---

1. The police are justified in conducting a limited "protective sweep" of a dwelling for their own safety and for the victims. *Maryland v. Buie*, 494 U.S. 325, 335–35, 110 S.Ct. 1093, 1099, 108 L.Ed.2d 276 (1990); *State v. Duncan*, 866 S.W.2d 510, 512 (Mo.App.1993); *see also Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Thompson v. Louisiana*, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984). A "quick and cursory" viewing of a residence is permissible to check for other persons who might present a risk to the officers. *United States v. Blake*, 484 F.2d 50, 57 (8th Cir.1973). It is well settled that items of incriminating evidence that are in plain view and seized during such a protective sweep are admissible. *See State v. Miller*, 499 S.W.2d 496, 499 (Mo.1973). *State v. Vineyard*, 497 S.W.2d 821 (Mo.App.1973); *State v. Dayton*, 535 S.W.2d 479 (Mo.App.1976). The protective sweep "may extend only to a cursory inspection of those spaces where a person may be found," *Maryland v. Buie*, 494 U.S. at 333–334, 110 S.Ct. at 1097–1098, and would include looking under a bed. Moving a bed, however, does not qualify as "quick and cursory."

ing and stomping his victim outside her bedroom window. Robyn Romanchuk saw Johnston beat Nancy Johnston with a lawn chair. Proof beyond a reasonable doubt that Johnston beat his wife savagely and over a long period of time did not depend on evidence of the rifle. At most, the rifle was cumulative and its presence added very little to the state's case when one considers the overwhelming, independent evidence of Johnston's guilt and the level of his malevolent brutality.

Failure to suppress the rifle and the decision to admit it into evidence was not prejudicial error.

As evidence, the bloody jeans are not necessary to prove that Johnston killed his wife. Again, other evidence established that fact beyond doubt. The bloody jeans could serve another purpose, however, they are evidence of Johnston's guilty mind and speak to the issue of deliberation. Contrary to Johnston's argument, the jeans are not alone in revealing Johnston's guilty mind. The bloody washcloth found in the bathroom shows that Johnston cleaned himself before calling for help. In addition, Johnston's own confession—induced without reference to the police discovery of the bloody jeans (*see* III C)—make the point that Johnston tried to hide his participation in the beating by hiding evidence of his guilt. Johnston's confession, therefore, is clear proof of Johnston's guilty knowledge. The trial court's failure to suppress the jeans was not prejudicial error.

### C.

Johnston's point on appeal under discussion here actually claimed that the "illegally seized evidence was then used to obtain a confession from Tim so that the confession was tainted and should have been suppressed." The record does not support this contention. At the police station, police confronted Johnston with the fact that his statement conflicted with the statements made by *witnesses,* not evidence. Maier testified:

Q. Did you confront him with any facts at that point?

A. [Maier] I basically told him I didn't believe him and that what he's telling me is completely inconsistent with what *witnesses* at the scene or near the scene had said. [Emphasis added.]

Q. How did he react when you told him you didn't believe him?

A. He began to cry.

Q. And did he make a further statement at that point when he began to cry?

A. Yes, he did

Q. What did he say?

A. He said she is the only thing I got. He said he'd kill the mother f[ ]s if he catches them.

. . . .

Q. After fingernail scrapings were taken, did you ask him any questions about his clothes—

A. Yes, sir.

Q. —what he was wearing? What did he say?

A. Said that they were under the bed in the residence in Michael's room.

Q. Did he tell you that he had changed clothes that night?

A. Yes, sir.

. . . .

Q. Did he admit to you that he had thrown those blue jeans under Michael's bed?

A. Yes, sir.

Without being confronted with any physical evidence, Johnston volunteered to the police that he changed clothes and hid his blood-covered jeans under Federhofer's bed. He offered the location of the jeans prior to knowing that the police had found them. Therefore, the discovery of the jeans could not have tainted the confession.

The point is denied.

### IV.

#### *Jury Selection*

■■■ Johnston raises several points of error relating to jury selection. Generally, venirepersons may not be excluded from a jury simply because they harbor a general objection to the death penalty or hold conscientious or religious beliefs against the death penalty. *Gray v. Mississippi,* 481 U.S. 648, 657, 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). The test for exclusion of a venireperson is whether it appears that a venire per-

son's views would prevent or substantially impair the performance of his or her duties in accordance with the instructions and oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). The trial court has broad discretion in determining whether prospective jurors are qualified. *State v. Kreutzer*, 928 S.W.2d 854, 866 (Mo. banc), *cert. denied*, —— U.S. ——, 117 S.Ct. 752, 136 L.Ed.2d 689 (1996). This Court will not disturb the trial court's ruling unless it is clearly against the evidence and amounts to a clear abuse of discretion. *State v. Kinder*, 942 S.W.2d 313, 324 (Mo. banc 1996).

### Venireperson Brown

■ Johnston challenges the trial court's action in sustaining the State's motion to dismiss venireperson Brown for cause. Brown stated unequivocally that he could not, under any circumstances, consider voting to impose the death penalty. In later questioning, Brown equivocated and said that he might be able to vote for the death penalty. The court acted within its discretion in dismissing Brown for cause, recognizing that his responses were "illogical and inconsistent" and that he would not be a "a reliable juror." Deferring to the trial judge's superior ability to assess a potential juror's demeanor, we find no abuse of discretion. *Wainwright v. Witt*, 469 U.S. 412, 424–426, 105 S.Ct. 844, 852–852, 83 L.Ed.2d 841 (1985); *State v. Feltrop*, 803 S.W.2d 1, 7 (Mo.banc 1991).

### Venireperson Ewertz

Johnston moved to strike Venireperson Ewertz for cause. The trial court overruled the motion. We have reviewed her statements during voir dire and find that the trial court acted within its discretion in keeping her on the panel. The record confirms that the trial court "watched her closely" and found that when she was asked "a very direct question on the subject of whether she could be opened minded as to punishment ... she answered clearly that she could be." We find no abuse of discretion. *Id.*

### Venireperson Flamm

Johnston assigns error to the trial court's decision to overrule his motion to dismiss venireperson Flamm for cause. Flamm, too

indicated that he could consider the entire range of punishment and would be fair and impartial. We find no abuse of discretion in the trial court overruling the strike for cause. *Id.*

### Venireperson Grawich

Johnston also challenged venireperson Grawich for cause. The trial court found that "she said unequivocally that she could be open and would consider the full range of punishment.... [H]er responses lead me to conclude that she is open and objective...." Again, giving appropriate deference to the judge who saw and heard Grawich's responses, we find no abuse of discretion. *Id.*

### Venireperson Howard

■ Johnston claims that the trial court erred in sustaining the state's motion to dismiss venireperson Howard for cause. However, Howard recalled that a police officer named Maier "beat-up" her son several years earlier. Howard was not certain whether it was the same officer that investigated this murder. However, her answers suggested that she was already suspicious of any testimony given by an officer named Maier. Further, she had been a victim of domestic violence and incest. It was within the judge's discretion to strike her for cause. The judge noted, "the way she appeared before me, she was I don't think [sic] a fit person for either side of the issue."

The point is denied.

### Alleged Batson Violation

■ Johnston claims a violation of *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986), and *J.E.B. v. Alabama*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), in the trial court's failure to sustain his objections to the prosecutor's peremptory challenges to five female African–American venirepersons. The trial court's finding that a peremptory challenge was properly used will not be overturned absent clear error. *State v. Gray*, 887 S.W.2d 369, 384 (Mo. banc), *cert. denied*, 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995). A finding is clearly erroneous when "although there is evidence to support

it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *State v. Antwine*, 743 S.W.2d 51, 66 (Mo. banc), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988), *overruled on other grounds, Antwine v. Delo*, 54 F.3d 1357 (8th Cir.1995).

■ In response to a *Batson* challenge, the State must present a reasonably specific, clear, racially-neutral explanation for the exercise of the peremptory challenge. *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc), *cert. denied*, 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992). Once a prosecutor articulates an acceptable reason for a peremptory challenge, the burden shifts to the defendant to demonstrate that the strike was nonetheless racially motivated. *Id.*

The State explained its exercise of its strikes: one venireperson's relative was a convicted murderer who had been beaten by a corrections officer; the second venireperson "straddled the fence" during death-certification; the third venireperson slept through parts of the voir dire and gave weak responses during death-certification; the fourth venireperson seemed confused and ambivalent during death-qualification, her son had been in custody as a juvenile for car theft and her former boyfriend was in prison for assault; and the fifth venireperson seemed very hesitant about whether she could consider the death penalty. The trial court found the State's reasons for exercising its challenges were race-neutral and held that Johnston had not met his burden of proving that the factors were pretextual despite their facial validity. On the strength of this record, we conclude that the trial court did not err. The point is denied.

## V.

### *Proof of Deliberation*

■ Johnston challenges the sufficiency of the evidence to show deliberation. In determining the sufficiency of the evidence on appeal, this Court must view the evidence in the light most favorable to the verdict, accepting as true all of the State's evidence, giving the State the benefit of all inferences therefrom and disregarding all evidence and inferences contrary to a finding of guilt.

*State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). Deliberation is "cool reflection upon the matter for any length of time, no matter how brief." Section 565.002.3, RSMo 1996.

A person's thought processes are generally invisible except as they are manifested by actions. Proof of deliberation, therefore, is ordinarily a function of evidence of the circumstances surrounding the killing. *State v. O'Brien*, 857 S.W.2d 212, 218–219 (Mo. banc 1993); *State v. Gilmore*, 661 S.W.2d 519, 525 (Mo. banc 1983), *cert. denied*, 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984). "Where a defendant commits a murder which, because of the particular method of attack, required some time to complete, this Court has permitted an inference of deliberation." *O'Brien* at 218–219. *See, e.g., Antwine*, 743 S.W.2d at 72 (inference of premeditation supported by the fact that defendant bypassed four separate opportunities to abandon his plan to kill second victim and by fact that defendant, finding himself in police custody and manacled, still managed to kill the second victim by stomping him to death); *State v. Sandles*, 740 S.W.2d 169, 177–78 (Mo. banc 1987), *cert. denied*, 485 U.S. 993, 108 S.Ct. 1303, 99 L.Ed.2d 513 (1988) (twenty stab and slash wounds provided sufficient basis for inference of deliberation); *State v. Sturdivan*, 497 S.W.2d 139, 142 (Mo.1973), *overruled on other grounds, State v. Anderson*, 515 S.W.2d 534, 542 (Mo. banc 1974) ("premeditation may be reasonably inferred from the bare hand strangulation of defendant's victim and the subsequent application of the towel for two or three minutes longer to make sure he was dead").

■ Johnston concedes in his brief, as he did at trial, that he beat his wife to death. Proof of deliberation does not require proof that the defendant contemplated his actions over a long period of time, *State v. Feltrop*, 803 S.W.2d 1, 11 (Mo. banc), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991), only that the killer had ample opportunity to terminate the attack once it began. Johnston chased the car his wife was driving, jumped on the hood and clung to it as she drove down the street. After she stopped

the car and tried to escape, he chased her down and started beating her in a nearby yard. This infers deliberation at least for the amount of time it took to reach her. *See State v. Beishline,* 926 S.W.2d 501, 511 (Mo. App.1996); *see State v. Smith,* 781 S.W.2d 761, 765 (Mo. banc 1989), *vacated on other grounds,* 495 U.S. 916, 110 S.Ct. 1944, 109 L.Ed.2d 306 (1990) (evidence that a defendant had to take a few steps before stabbing the victim gives rise to a reasonable inference of sufficient deliberation, *citing State v. Clemmons,* 753 S.W.2d 901, 906 (Mo. banc), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988)).

Eyewitnesses testified that Nancy Johnston tried to escape, but Timothy Johnston chased her down again and continued the savage beating. Johnston claimed that—after striking his wife several times—they reached a mutual decision to go home. Johnston ignored several attempts by witnesses to stop the beating, but acknowledged by vulgar responses those entreaties. He stopped kicking and stomping Nancy long enough to drag her to the car, ignore a police inquiry, drive away in a manner that showed a desire to elude a police, and changed the venue of the assault to a more private place, less susceptible to interruption. Once he arrived at his residence, he continued to beat her interrupting the process several times to obtain new tools with which to enhance his efforts.

■■■■ A prolonged struggle is evidence of deliberation. *See State v. LaRette,* 648 S.W.2d 96 (Mo. banc), *cert. denied,* 464 U.S. 1004, 104 S.Ct. 515, 78 L.Ed.2d 702 (1983). Deliberation may also be inferred when there are multiple wounds or repeated blows. *State v. Roberts,* 709 S.W.2d 857, 863 (Mo. banc), *cert. denied,* 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986); *State v. Clark,* 913 S.W.2d 399, 404 (Mo.App.1996); *State v. Barnes,* 740 S.W.2d 340, 344 (Mo.App.1987); *State v. Howard,* 896 S.W.2d 471, 481 (Mo. App.1995); *State v. Hurt,* 668 S.W.2d 206, 215 (Mo.App.1984).

■■■ Johnston also appears to argue that he was incapable of deliberating because he allegedly was intoxicated. We addressed this issue in *State v. Erwin,* 848 S.W.2d 476, 482 (Mo. banc 1993), *cert. denied,* 510 U.S.

826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993), and again in *State v. Roberts,* 948 S.W.2d 577 (Mo. banc 1997). "A person who voluntarily puts himself ... into a[n intoxicated] condition is capable of forming an intent to kill." *State v. Roberts,* 948 S.W.2d at 588.

On the basis of this overwhelming evidence, a jury could find beyond any reasonable doubt that Johnston deliberated. The point is denied.

## VI.

### *Prosecutorial Misconduct*

### A. *Alleged Prejudicial Statements: Guilt Phase*

### 1. *Undisclosed/ Inflammatory Statements*

#### *a.*

■■■ Johnston alleges unfair surprise by and resulting harm from the prosecutor's failure to disclose a statement by Michael Federhofer. Federhofer testified at trial that "[Johnston told me] [i]f I called the police he'd kill me too." The statement was never reduced to writing and was never discovered in a deposition. After consulting the depositions, the trial court found that Federhofer made a "spontaneous voluntary answer to a previously unsolicited question made to him for ... information that apparently was not discovered before from either side...."

A discovery violation under Rule 25.03 depends on the State's failure to disclose "written or recorded statements" of witnesses and summaries of witnesses' oral statements. Rule 25.04(a) requires the state, upon motion, to disclose "material and information not covered by Rule 25.03." These rules do not require the State to disclose what it does not have.

Johnston relies on *State v. Harrington,* 534 S.W.2d 44 (Mo. banc 1976). In *Harrington,* the state failed to deliver a copy of the defendant's statement to an FBI agent. This Court noted that discovery is designed to avoid surprise. " 'Simple justice requires that a defendant be permitted to prepare to meet what thus looms as a critical element of the case against him.' " *Id.* at 47, *quoting State v. Scott,* 479 S.W.2d 438, 442 (Mo. banc

1972). As in *Harrington*, the "critical element" relational lies at the heart of *State v. Whitfield*, 837 S.W.2d 503, 507 (Mo. banc 1992), another case in which Johnston seeks solace. In *Whitfield*, this Court reversed a first-degree, death penalty conviction where the state failed to endorse its firearms expert as a witness and failed to disclose that a coat that contained bullet holes and was owned by a wounded witness would be introduced into evidence. The defense had decided to attack that wounded witness as the "center" of its strategy. The coat, however, corroborated the witness's credibility and the accuracy of her testimony and severely injured the defendant's theory of the case.

The surprise in *Harrington, Scott*and *Whitfield* was the product of the state's withholding information that it possessed, that was critical to the case and that the defense would have had an opportunity to prepare to attack or blunt its influence had it been disclosed. This case is distinguishable from *Harrington, Scott* and *Whitfield*. First, the trial court considered Johnston's objection and determined that the State did not have knowledge of the eleven-year-old Federhofer's statement prior to his trial testimony. The statement was not undisclosed; it was undiscovered. This ends the inquiry.

Johnston had the opportunity to cross-examine Federhofer about his statement and seek a continuance to consider strategy when faced with its discovery during trial. His brief before this Court shows that he has not yet discovered an argument or evidence in the years of reflection since the trial that would show what Johnston would have been able to do to negate the statement had he learned of it prior to trial. Claims of surprise requiring a mistrial must be supported by some reasoned basis for the existence of actual prejudice. Johnston offers none.

#### b.

■ Johnston also complains that emergency medical technician James Motlik testified that he remembered the emergency call "[b]ecause it was the most brutal beating [he] had] ever seen," in twenty-five years of ambulance work. According to Johnston, the statement prejudiced him and required a mistrial.

Motlik's recollection attempted to explain the clarity of his memory of the events on the night of Nancy Johnston's murder more than two years after the fact. The trial court found that the statement was unsolicited.

■ Unsolicited statements that are brief and limited in substance do not amount to reversible error in the absence of evidence that the prosecutor intentionally tried to inject unfair prejudice into the trial. *See State v. Kalagian*, 833 S.W.2d 431, 435 (Mo.App. 1992); *State v. Masterson*, 733 S.W.2d 40, 42 (Mo.App.1987). There was no evidence here that the prosecutor intentionally tried to inject this statement into the guilt phase of the trial. The trial court did not abuse its discretion in refusing to grant a mistrial.

#### 2. Unrelated Weapons

■ The State referred to the shotgun seized at the Johnston home during the guilt phase of the trial. Although Johnston did not object when officers described finding the shotgun at the house, he did object when Officer George referred to the shotgun during his testimony. The State concedes that the shotgun played no part in Nancy Johnston's death. Johnston now claims that the prejudice generated by the evidence of the shotgun rendered his trial fundamentally unfair.

The trial court erred in permitting the objected-to evidence concerning the shotgun. In light of Johnston's confession and the abundance of evidence proving he killed his wife, the error was not prejudicial. *See State v. Roberts*, 948 S.W.2d at 591 (discussion of fast driving, stealing license plates and one minor burglary would not encourage the jury to find Roberts guilty of murder).

#### 3. Endorsement of Deputy Wagganer

■ Johnston claims that since the State did not endorse Deputy Wagganer as a guilt-phase witness until the first day of trial, the trial court erred in failing to grant a continuance and in denying his motion to suppress Wagganer's testimony.

The State originally certified Wagganer as a penalty phase witness. In response to Johnston's motions to exclude evidence of

Johnston's prior threats to and beatings of his wife and for a continuance, the trial court heard Wagganer's proposed testimony at a pre-trial motion hearing. Wagganer testified about arresting Johnston on a prior occasion. The State certified Wagganer as a guilt-phase witness on the first day of jury selection.

Determining whether a sanction should be imposed for a discovery violation lies within the discretion of the trial court. *State v. Neil*, 869 S.W.2d 734, 738 (Mo. banc 1994). When the trial court declines to impose a sanction, we must determine whether the State's violation resulted in fundamental unfairness or bore a real potential for substantively altering the outcome of the trial. *Id.* Fundamental unfairness occurs in discovery violation cases when the State's failure to disclose results in defendant's genuine surprise at learning of an unexpected witness or evidence and the surprise prevents meaningful efforts by the defendant to consider and prepare a strategy for addressing the state's evidence. In this instance, the late certification caused no fundamental unfairness, nor did Wagganer's testimony substantively alter the outcome of the trial. This is because Johnston knew the details of Wagganer's likely testimony at the penalty phase prior to trial. Moreover, Wagganer's testimony was neither complex nor lengthy. Johnston could not claim prejudicial surprise when the State chose to offer Wagganer's testimony at a different part of the trial.

In a related claim, Johnston claims that a statement he volunteered to Wagganer on February 16, 1989—which was admitted at trial—was obtained in violation of his 6th Amendment right to counsel and should have been suppressed. The statement, however, was made during Wagganer's investigation of a previous, separate charge (tampering with a witness). Johnston's statement—that "he would kill the bitch [Nancy] for f___ it up"—was in response to Wagganer's admonition to Johnston to stop making harassing phone calls to Nancy to get her to drop charges against him or he would face potential prosecution. The statement did not arise from an interrogation. Assuming arguendo that Johnston's statement was the product of an interrogation (which it was not), the Sixth Amendment right to counsel

is offense-specific. *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). There is no constitutional violation here. *See State v. Parker* 886 S.W.2d 908, 918 (Mo. banc), *cert. denied*, 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995); *State v. Brown*, 902 S.W.2d 278, 291 (Mo. banc), *cert. denied*, —— U.S. ——, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995).

### B. Penalty Phase

#### 1. Unrelated Weapons

During the penalty phase the State attempted to introduce a revolver, a cartridge taken from the revolver and a magazine for the revolver. Johnston objected, claiming that the state had failed to connect this evidence to Johnston. The trial court sustained the objection, but overruled Johnston's subsequent motion for a mistrial. Johnston assigns error to the trial court's refusal to sustain the mistrial motion.

As is repeatedly said in the cases, the trial court's decision overruling a motion for a mistrial is subject to review only for abuse of discretion. This rule recognizes the trial court's superior ability to judge the affect of the improperly advanced evidence on the jury and to offer the appropriate curative under the circumstances. Sustaining the objection signaled to the jury the impropriety of the State's attempt to use this evidence. We cannot conclude on this record that the trial court abused it discretion in overruling the motion for a mistrial.

#### 2. Prejudicial Statements

##### a. Religious References

Johnston assigns error to references the prosecutor made in closing argument to Satan, Jesus Christ, and God. The only challenge which was preserved for direct appeal is the reference to Satan.

The State said, referring to Johnston, "Ladies and gentlemen ... there sits Satan. There sits the embodiment of evil." Such argument is improper. However, Johnston's counsel immediately objected and the trial court sustained the objection, instructing the jury to disregard the statement.

Because the trial court observes the testimony and its impact, appellate review is for abuse of discretion. *See State v. Parker*, 886 S.W.2d at 922; *State v. Feltrop*, 803 S.W.2d 1, 9 (Mo. banc), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). Giving the trial court the benefit of its superior position to weigh impact, we cannot say that the trial court erred in limiting the remedy to the instruction it gave. The point is denied.

### b. Domestic Violence

■ Johnston objected when the prosecutor said "[domestic violence] is ten times more violent on the average than when [violence] happens on the streets." If this statistic is even true, it was not a fact in evidence. The trial court erred in overruling Johnston's objection to this statement. *State* v. *Storey*, 901 S.W.2d 886, 900–901 (Mo. banc 1995).

■ Do these ill-considered words require reversal of Johnston's death sentence as Johnston requests, citing *State v. Storey*, 901 S.W.2d at 900–901? No. *Storey* adopted a reasonable-probability-of-affecting-the-outcome test on review for claims of prejudice when counsel fails to object to penalty-phase closing argument. *Id.* at 903. *State v. Taylor*, 944 S.W.2d 925, 938 (Mo. banc 1997), applies the same "reasonable probability" standard to preserved penalty-phase-closing-argument error.

Johnston thus suggests that the State's previously-quoted, erroneous comment created a reasonable probability that the jury would ignore the court's instructions, defense counsel's argument, and the penalty phase evidence to reach a death recommendation in which the State's comment played an outcome-determinative role. *Taylor* and *Storey* say that some closing-argument words can have that power. The words that Johnston challenges, however, do not have that talismanic effect. They do not misdirect the jury's attention nor do they run contrary to the instructions. These words are error, but there is no reasonable probability that the jury decided as it did because they relied on them. The point is denied.

## VII.

### Alleged Instructional Error

### A. Guilt Phase

### Lesser Included Offense Instruction

■ Johnston assigns error to the trial court's refusal to submit his proposed second degree murder and voluntary manslaughter instructions. The rule is that if there is any doubt concerning the evidence, the trial court should resolve any doubts in favor of instructing on a lower degree of the crime, leaving it to the jury to decide which of two or more grades of offense, if any, the defendant is guilty. *State v. Santillan*, 948 S.W.2d 574 (Mo. banc 1997). Second degree murder differs from first degree murder in that second degree murder requires no deliberation. *Id.* at 576.

Johnston's proposed second degree murder instruction instructed the jury that second degree murder required a finding that he did not act "under the influence of sudden passion arising from adequate cause." The trial court refused Johnston's proffered second-degree instruction and gave the jury a second degree instruction without reference to sudden passion.

The evidence in this case does not support any instructional reference to sudden passion arising from adequate cause. Sudden passion is "passion directly caused by and arising out of provocation by the victim which arises at the time of the offense and is not solely the result of the former provocation." Section 565.002(7), RSMo 1994. Without nearly attempting to summarize the evidence in this case, it is clear that Johnston began his murderous beating of his wife because they had a previous argument and she came home. This is not adequate provocation by Nancy Johnston. That they had an earlier argument is at most "former provocation." Former provocation will not support a voluntary manslaughter instruction. Section 565.002(7).

Moreover, because the jury found Johnston guilty of the greater of the two instructed crimes, he could not have been prejudiced by the refusal to give an instruction on yet another lesser crime. Johnston was not

prejudiced by the court's refusal to submit this instruction. *State v. Six,* 805 S.W.2d 159, 164 ·(Mo. banc), *cert. denied,* 502 U.S. 871, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991).

The point is denied.

### B. Penalty Phase

▪ Johnston claims the trial court's refusal to submit his first proposed instruction on statutory mitigating circumstances prejudiced him. The trial court did submit nine of Johnston's eleven requested mitigators. Johnston's requested instruction contained two mitigators that the trial court did not submit to the jury—that Johnston had no significant criminal history and that Johnston's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.

Johnston had a significant criminal history, including several misdemeanor convictions. The trial court gave Instruction No. 19, which said that Johnston "has no prior felony convictions." This instruction much more accurately described Johnston's criminal history.

▪ As to the second mitigator Johnston sought, some evidence showed that Johnston was a problem drinker. No evidence showed that his consumption of alcohol on the night he beat his wife to death impaired his ability to appreciate the wrongfulness of his conduct and to conform his conduct to the law. The trial court instructed the jury to consider "whether the murder ... was committed while the defendant was under the influence of extreme mental or emotional distress." Additionally, Instruction No. 19 stated that jurors "may consider any circumstances which [they] find from the evidence in mitigation of punishment."

The trial court did not err in refusing Johnston's two proposed mitigators. The point is denied.

### VIII.

### Jury Deliberations

▪ Two hours into their deliberations, the jury sent a note to the court asking: "Is the jury required by law to be unanimous on each element contained in the count in order to be unanimous on that count?" The trial court, after conferring with counsel in chambers, answered in writing: "The jury is to be guided by the instructions as given."

The instructions given to the jury stated that the jury could not find Johnston guilty "unless you find and believe from thé evidence beyond a reasonable doubt each and all" of the elements.. Also, the jurors were instructed that "[e]ach of you must decide the case for yourself," that the verdict "must be agreed to by each juror" and that "the verdict must be unanimous."

Johnston claims that the trial court violated his constitutional right to due process in failing to explain the instructions further. We disagree.

▪ Responses that simply refer the jury to the proper instructions already given are not improper. *State v. Duisen,* 428 S.W.2d 169, 177 (Mo. banc 1967), *cert. denied,* 390 U.S. 962, 88 S.Ct. 1063, 19 L.Ed.2d 1159 (1968); *State v. Grant,* 275 S.W.2d 332, 335 (Mo.1955). We do not find that the jury could have been misled to the defendant's prejudice by this answer, as it merely suggested to the jury that they had their answer if they would consider the correct, clear and unambiguous instructions already given. *Duisen,* 428 S.W.2d at 177. The point is denied.

### IX.

### Rule 29.15 Issues

Johnston's Rule 29.15 motion outlines numerous claims of ineffective assistance of trial counsel. We have reviewed each of the claims of ineffective assistance carefully and determined that the claims not individually addressed below contained no grounds upon which a reasonable probability of outcome-determinative prejudice to Johnston—based on counsel's acts or failures to act—could be found. *Strickland,* 466 U.S. at 694–96, 104 S.Ct. at 2068–69. Since individual analysis of these claims would provide no precedential value, they are denied without further discussion. RULE 84.16(b).

## A. Guilt Phase

### 1. Psychiatric Evidence

 Johnston assigns error to the motion court's decision to deny relief based on defense counsel's alleged ineffectiveness for failing to investigate and present mental health evidence of a psychiatrist's apparent finding that Tim could not deliberate because of head injuries, alcohol dependence and either organic or personality disorder. The motion hearing record indicates that defense counsel carefully considered whether to put on psychiatric evidence and determined that the court-appointed psychiatrist, Dr. Parwatikar, the psychiatrist whose absence Johnston condemns, could have been particularly damaging to Johnston. In his depositions, Dr. Parwatikar initially testified that Johnston suffered from emotional and mental duress and that he suffered an impaired ability to conform his behavior to the law's requirements. On cross-examination, however, Dr. Parwatikar agreed that Johnston did not suffer from a mental disease or defect at the time he beat Nancy Johnston to death. In addition, by the time of his interview and evaluation by Dr. Parwatikar, Johnston attempted to report a version of facts that did not agree with eyewitnesses accounts of the murder and Dr. Parwatikar's reliance on Johnston's misstatements rendered his initial conclusion suspect.

Defense counsel decided, after due consideration, that Dr. Parwatikar's testimony bore the potential for substantial damage to Johnston's defense.

Defense counsel also declined to call another psychiatrist who had seen Johnston in late 1988 and early 1989 as a witness. Counsel obtained and reviewed that psychiatrist's notes for the possible purpose of corroborating Dr. Parwatikar's testimony. When counsel decided not to ask Dr. Parwatikar to testify, the need for the second psychiatrist evaporated.

Counsel's decision not to call a witness—either at guilt phase or penalty phase—is presumed to be a matter of trial strategy and will not support a claim of ineffective assistance of counsel unless the appellant clearly establishes otherwise. *Sanders v. State*, 738 S.W.2d 856, 858 (Mo. banc 1987); *State v. Patterson*, 826 S.W.2d 38, 41 (Mo.App.1992).

Here, the trial court found ample, well-considered, strategic reasons for defense counsel's decisions not to present the psychiatric testimony. The point is denied.

### 2. Failing to Obtain an MRI

 Johnston claims his trial counsel was ineffective in failing to obtain and present to certain experts' "objective evidence" of his alleged brain damage. Johnston asserts that the motion court erred in not ordering Johnston transferred to a hospital for a magnetic resonance imaging (MRI) test to determine the existence of any brain abnormalities as part of the Rule 29.15 proceeding.

Before trial, standard neuropsychological and EEG testing was performed on Johnston; neither showed brain damage. Since the initial test for neurological abnormalities was normal, counsel was not ineffective for failing to obtain further, more detailed testing. *Cf. State v. Mease*, 842 S.W.2d 98, 114 (Mo. banc 1992), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993). Nor did the motion court err in not ordering an MRI, given the failure of the EEG and the standard neuropsychological testing to reveal any brain abnormalities.

The point is denied.

### 3. Failure to Object to Prosecutorial Misconduct

#### a. Your Neighbors

 The State ended its guilt phase closing argument:

When this trial is over you'll have a chance to go home. Then you can talk to your neighbors and your friends about this case.... You can tell them about a man who beat his wife over and over again.

. . . .

After you tell your friends and neighbors, then they're going to ask you ["]what did you find him?["] Well, we just convicted him of murder second degree. And they're going to look at you and they're going to say based on that? Based on what that man did to that women?

Defense counsel did not object. Johnston claims this was ineffective assistance of coun-

sel because of the alleged impropriety and prejudicial nature of these remarks. Johnston does not identify with more specificity the basis for this claim.

This Court has said that personalized argument designed to suggest that jurors are in danger if the defendant is acquitted is improper. *State v. Phillips,* 940 S.W.2d 512, 519 (Mo. banc 1997). The argument in Johnston's trial is of a different ilk. It suggests not personal danger, but an inability to justify a second-degree murder conviction on the basis of the evidence in this case. This is not improper argument. The motion court did not err in overruling this point.

### b. *Names/Bad Character*

■■■■ Johnston next complains that the prosecutor prejudicially described him as an animal and not a man, and that the prosecutor repeatedly called him "macho man" and referred to "the violent world this guy operates in," all without objection. References to defendant's as "animals" or "monsters" do not form the basis for a reversal when the characterization is supported by evidence. *State v. George,* 921 S.W.2d 638, 644–45 (Mo. App.1996); *State v. Munoz,* 678 S.W.2d 834, 835–36 (Mo.App.1984); *State v. Mayfield,* 562 S.W.2d 404, 412 (Mo.App.1978). This is such a case. Further, when viewed in context, these statements described evidence of Johnston's historical penchant for the use of violence as a solution to disputes. This was a permissible restatement of the facts in evidence. The motion court did not err in concluding that these statements did not have decisive effect on the trial and in overruling the Rule 29.15 motion on this point.

### B. *Penalty Phase*

### 1. *Decision to Seek Death*

■■■■ Johnston asserts that the prosecutor improperly invoked the authority of his office by stating that he had carefully decided to seek the death penalty. Johnston's counsel did not object. The prosecutor said:

There are times when murder in the first degree may involve punishment. But in keeping with the concept that the punishment must fit the crime, there are times where *we representatives of the State seek* the highest penalty.

We don't seek that lightly because it's not sought in every case. And it is sought for good reason.

It is sought out because of hard core evidence, and I would assure you it's not a decision that's come to lightly.

(Emphasis ours). In support of his argument, Johnston cites *Newlon v. Armontrout,* 693 F.Supp. 799, 805 (W.D.Mo.1988), *aff'd,* 885 F.2d 1328 (8th Cir.1989), and *State v. Evans,* 820 S.W.2d 545, 548 (Mo.App.1991). In each of those cases the prosecutor did far more than relate that he had decided to *seek* the death penalty. In *Newlon,* the prosecutor stated that he had never seen anyone who deserved the death penalty more than the defendant. And in *Evans,* the prosecutor stated that he would not have brought the charge against an innocent defendant. Both cases are patently distinguishable.

The motion court did not clearly err in overruling Johnston's Rule 29.15 motion on this point.

### 2. *Judge to Decide Punishment*

■■■ Johnston claims that the prosecutor sought to lessen the jurors' sense of responsibility by telling them they could let the judge decide the punishment. Johnston's counsel did not object. The prosecutor said:

There is also another verdict form that permits you to set the punishment at life in prison, and Mr. Wolfrum will get up here in a few minutes and I will most certainly guarantee you that is what he will ask for. *And there is a third verdict form which involves you may let the court decide the punishment. [sic] That is an option left open to the jury.*

And there is a fourth verdict form....

■■■ The State may explain the instructions to the jury, provided the State does not misstate the law. *State v. Roberts,* 709 S.W.2d 857, 869 (Mo. banc), *cert. denied,* 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986). The State did not misstate the law here.

On review of the motion court's holding, we conclude that the motion court did not clearly err in overruling Johnston's Rule 29.15 motion.

### 3. Psychiatric Evidence

 Johnston claims that trial counsel served him ineffectively when trial counsel failed to offer the jury expert testimony of Johnston's alcohol and drug dependence during the penalty phase. Johnston asserts that defense counsel's failure to call Drs. Parwatikar, Yutzy and Gaskin fell below the performance required of a reasonably competent attorney and prejudiced Johnston in that the jury might reasonably have returned a life without parole recommendation instead of a death recommendation had they heard this evidence. Reasonable trial strategy does not become ineffective assistance of counsel because it did not work as hoped. *Strickland v. Washington,* 466 U.S. 668, 681, 104 S.Ct. 2052, 2061, 80 L.Ed.2d 674 (1984).

At the Rule 29.15 hearing, Johnston's trial counsel testified of his awareness of the evidence to which Johnston refers and described his strategy as an attempt to portray Johnston "in the most favorable possible light" and to avoid "problem areas." Johnston's argument that counsel's decision to exclude this evidence was not a reasonable strategic decision assumes that the medical evidence provided an unalloyed basis for mitigation. It does not.

As we have previously discussed, Dr. Sadahir Parwatikar founded his conclusions about Johnston based on Johnston's inaccurate version of the events leading up to and surrounding the death of Nancy Johnston. In addition, the Parwatikar report contained references to Johnston's "stormy" relationship with his wife and his inability to hold his temper when he drank; an admission to Malcolm Bliss Mental Health Center following Johnston threatening his wife by putting a gun to her head while she was driving; and numerous prior driving while intoxicated convictions.

Dr. Sean Yutzy's report cited numerous instances of Johnston's violent behavior that included multiple threats by Johnston that he would kill his wife. In addition, Yutzy's report, like Parwatikar's, was founded on inaccurate facts. Trial counsel "feared [the state's] ability to make [the factual inaccuracies] seem extremely significant."

Dr. Fred Gaskin treated Johnston prior to the murder and saw Johnston last, six months prior to Nancy Johnston's death. Gaskin's conclusions that Johnston suffered from alcohol dependency and "post head trauma syndrome" were founded entirely on Johnston's own version of his life. Gaskin did not attempt to corroborate his conclusion with independent sources. Aware of these deficiencies in the Gaskin records, which trial counsel reviewed, trial counsel testified that he wanted to use Gaskin's finding to support Parwatikar's testimony rather than use Gaskin as a witness himself.

The motion court found that Johnston's counsel made reasonable strategic decisions as to Parwatikar and Yutzy. As to Gaskin, the trial court found that Johnston failed to "allege to what end this evidence should have been offered." The point is denied.

### 4. Mitigation

 Johnston claims that defense counsel was ineffective in failing to investigate and present a variety of witnesses to testify to Johnston's background, including: his good work record, the effect of the death of his father on him, his early contact with alcohol and drugs and his lack of a "significant criminal history."

 Much of the above information was already before the jury. George Johnston, Johnston's brother, testified about their parents' divorce and about the impact of their father's death on Timothy. Johnston's mother testified that the death of Timothy's father was very traumatic to him. Johnston's cousin testified to the same effect. Numerous witnesses praised Johnston's work habits while he was in jail. Further evidence on these issues would have been cumulative. Failing to present cumulative evidence is not ineffective assistance of counsel. *See State v. Clemons,* 946 S.W.2d 206, 221 (Mo. banc 1997); *State v. Kinder,* 942 S.W.2d 313 (Mo. banc 1996).

 Johnston's trial counsel testified that he attempted to present Johnston in the most favorable light possible and to avoid the problem areas of his life. Ineffective assistance of counsel claims are not meant to be a means to second guess the trial strategy of the defense. Where trial counsel reasonably

decides as a matter of trial strategy to pursue one evidentiary course to the exclusion of another, trial counsel's informed, strategic decisions not to offer certain evidence is not ineffective assistance. *Leisure v. State,* 828 S.W.2d 872, 875 (Mo. banc), *cert. denied,* 506 U.S. 923, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992). Trial counsel's decision in this case was informed and strategic. The point is denied.

### 5. *Procedural Waiver*

Johnston raises several other points that were neither objected to at trial nor contained in the Rule 29.15 motion. He seeks plain error review under Rule 30.20. As is the case with plain error review generally, *see* II, *supra,* this Court declines to entertain plain error review unless the request for plain error review facially establishes substantial grounds for believing that "a manifest injustice or miscarriage of justice has resulted therefrom." Rule 30.20. Johnston's requests for plain error review do not meet this standard. The points are procedurally waived.

### X.

### *Proportionality Review*

Under section 565.035.3, RSMo 1994, this Court must determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

### A.

After careful examination of this record, we do not find that the trial court's imposition of the death sentence resulted from the influence of passion, prejudice, or any other arbitrary factor.

### B.

The sole statutory aggravating circumstance submitted by the trial court and found by the jury was that the murder of Nancy Johnston involved torture and depravity of mind and thus was outrageously and wantonly vile, horrible and inhumane. In order to find this aggravator, the jury had to find:

(a) That the defendant inflicted physical pain or emotional suffering on Nancy Johnston and the defendant did so for the purpose of making her suffer before dying, and

(b) That the defendant committed repeated and excessive acts of physical abuse upon Nancy Johnston and the killing was therefore unreasonably brutal, and

(c) That the defendant killed Nancy Johnston after she was bound or otherwise rendered helpless by defendant and that defendant thereby exhibited a callous disregard for the sanctity of all human life, and

(d) That the defendant, while killing Nancy Johnston or immediately thereafter purposely mutilated or grossly disfigured the body of Nancy Johnston by acts beyond that necessary to cause her death.

The jury found that the state proved each of these elements of the aggravator. The record fully supports their conclusion.

### C.

We consider similar cases where the trial court imposed the death sentence to determine whether the sentence in this case is proportionate.

This Court has repeatedly upheld sentences of death where the defendant physically abused, beat or tortured the victim, as Johnston did here. *See State v. Roberts,* 709 S.W.2d at 857; *State v. Kinder,* 942 S.W.2d 313 (Mo. banc 1996); *State v. McMillin,* 783 S.W.2d 82 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990); *State v. Sidebottom,* 753 S.W.2d 915 (Mo. banc), *cert. denied,* 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988); *State v. Walls,* 744 S.W.2d 791 (Mo. banc), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Lingar,* 726 S.W.2d 728 (Mo.

banc), *cert. denied,* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987); *State v. Gilmore,* 697 S.W.2d 172 (Mo. banc 1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986); *State v. Laws,* 661 S.W.2d 526 (Mo. banc 1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984); *State v. Turner,* 623 S.W.2d 4 (Mo. banc 1981). Given these precedents, Johnston's punishment is neither excessive nor disproportionate.

## XI.

The judgments are affirmed.

All concur.