**STATE of Missouri, Plaintiff–Respondent,**

v.

**Leo A. McCULLUM, Defendant–Appellant.**

No. 23920.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 31, 2001.

Motion for Rehearing and Transfer Denied Nov. 26, 2001.

Application for Transfer Denied Jan. 22, 2002.

---

**3.** In fact, the exhibits have not been filed with this court for our review.

James R. Wyrsch, J. Justin Johnson, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for Respondent.

KENNETH W. SHRUM, Presiding Judge.

A jury convicted Leo A. McCullum ("Defendant") of first-degree assault in violation of § 565.050.[1] Defendant was sentenced to thirty years' imprisonment per the jury's recommendation. Defendant's brief on appeal contains six points relied on. This court affirms the judgment of conviction and sentence.

## FACTS

The State charged in its information that on August 22, 1999, Defendant "attempted to kill or cause serious physical injury to Piper O'Neal ("Victim") by setting her on fire, and in the course thereof inflicted serious physical injury on [Victim]."

The evidence adduced at Defendant's trial included the following. Victim lived in Springfield, Missouri, with Defendant and his three children. On August 22, 1999, Defendant and Victim argued intermittently during the day about various topics.

After returning from shopping at approximately 9:30 p.m., Defendant and Victim quarreled again, this time in the ga-

---

1. All statute references are to RSMo 2000 unless otherwise indicated.

rage. This argument escalated into a physical fight, during which Defendant hit Victim with a beer bottle. In one version of several statements Defendant made to police after his arrest, he said the bottle broke and cut Victim above the right eye. The fight continued in the garage, with Victim screaming and yelling at Defendant. After the combatants ended up on the garage floor, Defendant picked up a five-gallon can of lacquer thinner and poured part of the contents on Victim's head and shoulder area. Defendant admitted he knew the thinner was a flammable substance and that he had a cigarette lighter in his hand at the time. According to this account, Defendant went back into the house and Victim then ran past him out the front door. Thereon, Defendant chased Victim and caught her in the neighbor's yard where Victim was screaming and yelling, apparently "freaked out" because some lacquer thinner had gotten into the wound above her eye. According to Defendant, he had a lighter in his hand at the time, was flicking it, and Victim caught on fire.

Eyewitness testimony by neighbors included the following. Barbara Lee, who lived next door, heard a "commotion" in her front yard. She stepped out to look and saw Defendant chasing Victim, and then Victim was engulfed in flames. Victim was screaming, "He set me on fire." Also, Barbara witnessed Defendant drag Victim by her hair. Barbara ran back into her house where she told her son, Stan Lee, to call 911. When Barbara went back outside to get a water hose, Victim was lying on the ground and screaming for help. Defendant was gone.

Stan Lee testified he looked out his bedroom window after hearing a noise outside. He saw two people, a man and woman, chasing one another. Stan then saw the male figure reach out, saw a "flick of a cigarette lighter," and saw the woman go "up in flames." Next, Stan saw the male individual grab the female by the hair of her head. After calling 911, Stan went outside and found the Victim who was screaming, "He set me on fire."

An emergency medical technician, Katherine Knapp, called to the scene to treat Victim, assessed Victim's injuries as second and third-degree burns. While attending to Victim, Knapp heard Victim say, "Oh my god ... I can't believe he lit me on fire!" When Knapp asked Victim who set her on fire, Victim responded, "Leo A. McCullum, the son of a bitch."

After sheriff's deputies arrived and checked with Victim, they went to Victim's and Defendant's house. There they were met by Danielle, Defendant's fifteen-year-old daughter. After Danielle let the officers in the house, they walked through its various rooms and into the garage to assure themselves the children were safe and that Defendant was no longer on the premises. During this walk-through, the officers saw blood in the entry hall and blood and a broken beer bottle in the garage.

Later, a search warrant was obtained. During its execution, the officers found and seized from the garage a broken bottle, blood, and an open five-gallon container of lacquer thinner. Pictures of these items and the can of lacquer thinner were admitted at trial over Defendant's objection.

Additional facts are recounted as necessary during the analysis and discussion of Defendant's points on appeal.

## DISCUSSION AND DECISION

*Point I: Information Error: No "Substantial Step" Attempt Charged*

Defendant's first point maintains the trial court erred when it refused to dismiss

the information which charged him with first-degree assault, § 565.050.[2] The subject information complied with a form approved by the Supreme Court of Missouri, specifically MACH–CR No. 19.02 (10–1–98). Even so, Defendant challenged the sufficiency of the information by filing a motion to dismiss it on the morning of trial before voir dire commenced. Defendant's motion to dismiss was grounded, in part, on the premise that *State v. Withrow*, 8 S.W.3d 75 (Mo.banc 1999), mandated that the information charge a "substantial step" attempt, and that, because the information failed to do so, it was insufficient.[3] On appeal, Defendant's first point argues the trial court committed reversible error by not dismissing the information.

The information here was filed before *Withrow* was decided and was never amended. Until *Withrow* changed the law, if a first-degree assault information charged a person with *attempt* to kill or cause serious physical injury, the State's burden was to prove a "common law" attempt; the State could not get a sustainable conviction with evidence that only met the lesser "substantial step" definition of § 564.011. MACH–CR 19.02 (10–1–98) "Notes on Use 6."

Defendant argues that *Withrow* mandated the filing of an information in this case that conformed to MACH–CR § 18.02, i.e., an information that contained both an allegation Defendant engaged in described conduct and express language that "such conduct was a substantial step toward the commission of the crime." Defendant asserts the "substantial step" allegation is now an element of a first-degree assault crime.[4] Based on that premise, Defendant insists the trial court committed reversible error when it refused to dismiss the information because it did not contain the "substantial step" language comparable to that found in MACH–CR 18.02(7–1–97).[5]

■ When an essential element is omitted from an information, the sufficiency of that charging instrument is called into question. Any analysis of the sufficiency

---

**2.** Section 565.050, provides:

"1. A person commits the crime of assault in the first degree if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person."

"2. Assault in the first degree is a class B felony unless in the course thereof the actor inflicts serious physical injury on the victim in which case it is a class A felony."

**3.** In *Withrow*, the Supreme Court of Missouri specifically rejected the notion that there are two definitions of attempt in Missouri; the common law definition (evidence of "at least an apparent ability to commit the crime[,]" *State v. Reyes*, 862 S.W.2d 377, 383 (Mo.App. 1993)), and the definition provided in § 564.011.1 (proof of a "substantial step" toward the commission of the substantive offense). *Withrow*, 8 S.W.3d at 79. The *Withrow* court overruled *Reyes* and its progeny, declaring that "[a]n attempt to commit an offense, regardless of whether the attempt is under sec. 564.011 or under separate provisions proscribing attempting a specified

crime, means a substantial step toward the commission of an offense." *Id.* at 80.

**4.** We note that the Missouri Supreme Court has now promulgated MACH–CR 19.02 (effective 9–1–01), a new form for charging assault in the first degree. As worded, MACH–CR 19.02 (9–1–01) includes the "substantial step" language as part of the charging form information. Even so, "MACH–CR forms are not mandated for usage in the same sense that the MAI CR forms of pattern criminal instructions are required." MACH–CR 1.00.2; *State v. Mitchell*, 611 S.W.2d 223, 225–26 (Mo.banc 1981).

**5.** In pertinent part, the MACH–CR 18.02 (7–1–97) charge reads:

"The ... (Prosecuting Attorney) ... charges ... that ... (on) ... [date], the defendant [*Briefly describe the conduct of the defendant*.], and such conduct was a substantial step toward the commission of the crime of [*name of the offense* ] . . . . "

of an information must begin with a discussion of *State v. Parkhurst*, 845 S.W.2d 31 (Mo.banc 1992). *Parkhurst* teaches that a failure to allege an essential element in the indictment does not automatically require reversal. *State v. Briscoe*, 847 S.W.2d 792, 794 (Mo.banc 1993).[6] However, *Parkhurst* dealt only with a question of an untimely challenge to the information and created a narrow, strict standard of review. Therefore, the standard of review for timely-challenged objections to the information remains to be decided.[7]

In considering what is the appropriate standard of review, we note that the *Parkhurst* court relied on several federal cases in its analysis. Also, "[e]ach time our courts have compared the state and federal constitutional provisions, they have concluded that art. I, § 18(a) of the Missouri Constitution protects the same rights as the Sixth Amendment of the United States Constitution." *State v. Hester*, 801 S.W.2d 695, 697 (Mo.banc 1991).[8] *See also State v. Schaal*, 806 S.W.2d 659 (Mo.banc 1991) (confrontation rights); *State v. Bolin*, 643 S.W.2d 806 (Mo.banc 1983) (right to speedy trial); *Alexander v. State*, 864 S.W.2d 354 (Mo.App.1993) (compulsory process). Similarly, Article I, Section 10 of the Missouri Constitution provides the same guarantees as the federal constitutional due process rights. *State v. Hill*, 827 S.W.2d 196, 198 (Mo.banc 1992). It is appropriate, therefore, to look at federal standards when analyzing this claim of trial court error.

■ A sufficient charging instrument serves three constitutional purposes: (1) inform the accused of the charges against him or her so that he or she may prepare an adequate defense, (2) prevent retrial on the same charges in case of an acquittal, and (3) inform the court of the facts alleged to determine if those facts as alleged are sufficient, as a matter of law, to withstand motions (such as to dismiss) or support a conviction if one is to be had. *United States v. Hess*, 124 U.S. 483, 8 S.Ct. 571, 573, 574, 31 L.Ed. 516 (1888); *Russell v. U.S.*, 369 U.S. 749, 765–70, 82 S.Ct. 1038, 1047–50, 8 L.Ed.2d 240 (1962); *State v. O'Connell*, 726 S.W.2d 742, 746 (Mo.banc 1987).[9]

■ Omitting an essential element from a charging instrument hinders these aforementioned purposes, but the extent and prejudicial effect of the hindrance must be judicially determined. Under the federal standard of review, constitutional errors can be held harmless only if found harm-

---

6. The *Parkhurst* court overruled cases which held that a court acquires no jurisdiction when an essential element is omitted from the charging document reasoning that sufficiency of the information and subject matter jurisdiction are two distinct concepts.

7. In *State v. Isa*, 850 S.W.2d 876 (Mo.banc 1993), the supreme court required the defendant to demonstrate "prejudice" in order to prevail on her claim the indictment failed to allege an essential element, even though this was challenged by pretrial motion. *Id.* at 884–87. Unfortunately, this standard was not further delineated by the court because the defendant mistakenly relied on the premise the trial court lacked jurisdiction contrary to *Parkhurst*.

8. Defendant does not claim the state constitution reaches further than the federal constitution; consequently, we need only address his claims in light of the federal guarantees. *See State v. Shaw*, 847 S.W.2d 768, 773 n. 3 (Mo.banc 1993).

9. These purposes are derived from the Fifth and Sixth Amendments to the United States Constitution in federal criminal prosecutions. *Russell*, 369 U.S. at 760–64, 82 S.Ct. at 1045–47. In Missouri, the origins are grounded in Art. I, §§ 10, 18(a), and 19 of the state constitution. *State v. Stringer*, 211 S.W.2d 925, 929[8] (Mo.1948).

less beyond a reasonable doubt. *Chapman v. State of California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). In *Stringer*, 211 S.W.2d at 929, the court declared that if "there is no possible prejudice to the rights of the accused it is not necessary to follow the [common law rules of pleading]."

■ Here, we need not decide if the *Chapman* standard, the *Stringer* standard, or another standard of review is to be used when a defendant timely challenges an information that omits an element. This follows because we find Defendant suffered *no* prejudice at all due to the omission of "substantial step" language from the information.

The first reason we find no prejudice is that Defendant's trial counsel was on the committee that drafted the newly approved MACH–CR 19.02 which incorporates the substantial step language. Accordingly, in arguing to the trial court that it should dismiss the information against Defendant, defense counsel told the trial judge the committee would soon seek approval by the Supreme Court of Missouri of a charge form that contained such language; consequently, he insisted the information in Defendant's case should include the substantial step language. To argue now that Defendant did not have adequate notice of the charges to prepare a defense is disingenuous.

Second, the *Withrow* decision was handed down approximately eight months before trial, and during that interim, Defendant failed to make any objection to the information until the day of trial. Also, it would be specious to argue one does not have adequate notice of "substantial step" attempt to prepare one's defense because this was, in effect, included in the information that originally charged "common law" attempt. The *Withrow* court, in discussing the more difficult burden of proof under "common law" attempt, observed that the "[s]ubstantial step attempt was, in effect, a lesser included offense of common law attempt." 8 S.W.3d at 78.

Third, Defendant was in no way prejudiced because his *ability to prepare* a defense was not hindered depending on the type of attempt charged. This follows because his defense was that he did not intentionally set Victim on fire, i.e., he tried to show he was merely reckless. This defense would not have changed depending on the type of attempt.

Finally, the information was sufficient to plead former jeopardy. The information cited the statute and detailed the conduct from which the charges arose, i.e., setting Victim on fire. Moreover, the jury instructions made it clear that Defendant was convicted upon substantial step attempt. The information alone is not conclusive of the question regarding double jeopardy; one must look to the proceedings as a whole when analyzing double jeopardy claims. *State v. Stigall*, 700 S.W.2d 851, 855 (Mo.App.1985). Clearly, this proceeding would suffice for Defendant to plead former jeopardy.[10] Point I denied.

*Point II: Instructional Error*

Under Defendant's second point, he argues that "a fatal variance and/or constructive amendment existed between the information, proof at trial, and instructions submitted to the jury in this case." Defendant directs the court's attention to Instruction No. 5 in which the term "attempt" was defined as the commission of "any act that is a substantial step toward

---

**10.** Federal constitutional rights against double jeopardy are commensurate with those guaranteed under the state constitution.

*State v. Murphy*, 989 S.W.2d 637, 639[3] (Mo. App.1999). Defendant makes no assertion in this appeal that this right has been affected.

causing that [particular] result." Defendant claims this was a variance from that alleged in the information. Further, Defendant's point maintains he was prejudiced by the variance because he did not know which burden of proof the State had to bear at trial, i.e., "common law" attempt or "substantial step" attempt.

■ Initially, we note the concept of constructive amendment has no application here. Defendant has cited several federal cases that define when a constructive amendment occurs, but cites no Missouri precedent.[11] A constructive amendment is reversible error *per se* because it is a direct violation of the Grand Jury Clause of the Fifth Amendment of the U.S. Constitution. *U.S. v. Stuckey,* 220 F.3d 976, 981 (8th Cir.2000); *U.S. v. Wozniak,* 126 F.3d 105, 109 (2nd Cir.1997). In federal proceedings, when the right to a grand jury is not involved, constructive amendments can also affect due process and notice rights, but when this occurs, a prejudice analysis must be made to decide whether these rights were materially affected. *Stuckey,* 220 F.3d at 981 n. 5; *Lucas v. O'Dea,* 179 F.3d 412, 417 (6th Cir.1999). Therefore, two reasons exist why the concept of constructive amendment is inapplicable here.

■ First, the Fifth Amendment right to a grand jury is inapplicable to the states through the Fourteenth Amendment. *Alexander v. Louisiana,* 405 U.S. 625, 633, 92 S.Ct. 1221, 1226–27, 31 L.Ed.2d 536 (1972); *Cooksey v. Delo,* 94 F.3d 1214, 1217 (8th Cir.1996). Missouri allows a person to be charged for a crime by either indictment or information, thus showing, at least in part, why the Grand Jury Clause is a limitation only on the federal govern-

ment. Mo. CONST., art. I, § 17; *State v. Coleman,* 460 S.W.2d 719, 727[6] (Mo.banc 1970). Therefore, the concept of constructive amendment cannot attend here because the right from which it springs is not involved.

Second, Defendant was charged by *information* and not indictment. Consequently, no grand jury was involved and a prejudice analysis would be required even under federal precedent. *See Stuckey,* 220 F.3d at 981 n. 5; *O'Dea,* 179 F.3d at 417. For these reasons, Defendant's arguments regarding constructive amendment and reversible error *per se* are misplaced.

■ The second prong of Defendant's Point II asserts there is a fatal variance between the information and the verdict-directing instruction. At the outset, we note Defendant has failed to preserve this alleged error for appellate review. This follows because Defendant has failed to adduce any argument beyond mere conclusions that he was prejudiced thereby. *State v. Perry,* 954 S.W.2d 554, 570 (Mo. App.1997). Moreover, Defendant fails to cite any relevant authority, outside the applicable standard of review, which buttresses his argument that a fatal variance has occurred; consequently, this justifies a decision the point has been abandoned. *Koenig v. State,* 17 S.W.3d 911, 911–12[3] (Mo.App.2000). However, we have reviewed the record, *ex gratia,* and find no error. In discussing this prong of Defendant's point, we assume, *arguendo,* that a variance existed between the information and the jury instruction.

■ A variance, standing alone, is not conclusive to the question of whether reversible error exists. *State v. Lee,* 841

11. Independent research has uncovered one case which uses the term "constructive amendment." *See State v. Marks,* 721 S.W.2d 51, 55 (Mo.App.1986). There the court based

its decision that no constructive amendment occurred on several Missouri cases which dealt with "variances" and not constructive amendments.

S.W.2d 648, 650 (Mo.banc 1992). For a variance to be fatal, i.e., requiring reversal, the instruction must submit a new and distinct offense from that charged in the information. *State v. Jones*, 930 S.W.2d 453, 455[4] (Mo.App.1996).

"To justify a reversal, the variance must be material and prejudicial to the rights of the accused. A variance is material when it affects whether an accused received adequate notice from the information. A variance is prejudicial when it affects the defendant's ability to adequately defend against the charges presented in the information and given to the jury in the instruction." *State v. Jones*, 892 S.W.2d 737, 739 (Mo.App.1994) (citations omitted).

In this case, the reasons given in Point I on why the allegedly defective information did not prejudice Defendant are dispositive of Point II. Those reasons support our belief that the variance, if any, between information and instruction, was neither material nor prejudicial. We need not repeat those reasons here, other than to express our conviction Defendant had adequate notice and his ability to prepare a defense was in no way hindered. Point II is denied.

*Point III: Error in Failure to Instruct on Third–Degree Assault?*

In Defendant's third point on appeal, he alleges the trial court committed reversible error when it failed to submit Defendant's three proposed jury instructions on third-degree assault to the jury for consideration. Specifically, Defendant claims there was an evidentiary basis for the jury to have reasonably concluded that Defendant acted recklessly rather than purposely when he set Victim on fire.

Dispositive of Defendant's third point is the fact that his proposed

Instructions A, B, and C, on third-degree assault, were erroneous. As framed and proffered, Defendant's instructions would have submitted third-degree assault as additional different offenses, not as lesser-included offenses. This follows because Defendant left out the following language that is mandated for a lesser-included offense instruction:

> If you do not find the defendant guilty of [*name of offense from immediately higher verdict director*] as submitted in Instruction No.___, you must consider whether he is guilty of [*name of offense from lesser verdict director*] under this instruction.

*See* MAI–CR 3d 304.02, Notes on Use 3. Without this paragraph, Defendant's proposed Instructions A, B, and C would not have correctly instructed the jury. A trial court does not err when it refuses to submit an erroneous instruction. *Parkhurst*, 845 S.W.2d at 36–37; *State v. Kennedy*, 894 S.W.2d 723, 728[6] (Mo.App.1995). For this reason alone, Defendant's third point lacks merit.

Moreover, for the jury to consider third-degree assault, it was first required to find Defendant not guilty of first-degree assault. Instruction number "9" proposed to the jury, reads as follows: "*If* you do not find the defendant guilty of assault in the first degree as submitted in Instruction No. 5, you must consider whether he is guilty of assault in the second degree...." (Emphasis supplied.) As stated in *State v. Householder*, 637 S.W.2d 324[5] (Mo.App.1982):

> "It is unnecessary to discuss the question of whether a third degree assault instruction was supported by the evidence, as the lack of an instruction of such nature, even if error, was harmless. The jury, by finding [Defendant] guilty of first degree assault, did not take the first step in reducing the of-

fense to second degree assault. Under these circumstances, the jury could not have considered a third degree assault instruction, even if it had been given."

*Id.* at 328. *See also State v. Arellano,* 736 S.W.2d 432, 435[7] (Mo.App.1987); *State v. Stiles,* 712 S.W.2d 42, 44[3] (Mo.App.1986). For the reasons explained in *Householder,* the lack of a third-degree assault submission here, even if error, was harmless.

In relying on *Householder,* we do not ignore *State v. Hibler,* 5 S.W.3d 147 (Mo. banc 1999). There, the Supreme Court of Missouri reversed a defendant's convictions for second-degree assault because the trial court did not instruct the jury on third-degree assault. In doing so, the court explained:

> "[T]he serial approach to instructing a jury is logical and should continue to be followed. If there is a basis for acquittal of the offense charged, it is indeed logical to instruct on any lesser included offenses in descending order to determine whether there is a basis for conviction. Once the court determines that a basis for a conviction on a lesser included offense exists and that there is no basis to convict of a (lower) lesser included offense, it is fair to stop the inquiry."

5 S.W.3d at 151. However, *Hibler* did not overrule or disapprove of *Householder,* either directly or implicitly. This follows because the defendant in *Hibler* was convicted of assault in the *second degree,* not first degree as in *Householder.* This is a material factual distinction because in the latter circumstance, i.e., where a jury convicts of first-degree assault, the jury could not have considered a third-degree instruction, even if given. 637 S.W.2d at 328. On the facts of this case, *Householder* remains good law. Point III is denied.

*Point IV: Did Publicity Preclude Use of Greene County Jury?*

Defendant's fourth point maintains that reversible error resulted when the court rejected Defendant's many efforts to have a jury drawn from somewhere other than Greene County, Missouri. Defendant insists that "pretrial publicity occurred in this case which rendered it impossible for the potential jurors of Greene County to impartially render a decision as to [Defendant's] innocence or guilt."

Defendant urges reversal by asking this court to invoke a constitutional principle applied in *Irvin v. Dowd,* 366 U.S. 717, 723–28, 81 S.Ct. 1639, 1642–46, 6 L.Ed.2d 751 (1961). Specifically, Defendant insists we should find that adverse pretrial publicity in Greene County about Defendant and this crime created a *presumption of prejudice* in that county to the extent that the jurors' claims of impartiality should not have been believed by the trial court. Defendant insists that to convict him with a jury drawn from such a venue deprived him of his constitutional right to due process. He argues that although "[t]his principle has yet to be adopted or applied by Missouri courts ..., [it should be applied here] due to the sheer volume of publicity in this case[.]"

In *State v. Johns,* 34 S.W.3d 93 (Mo.banc 2000), *cert. denied,* 532 U.S.1012, 121 S.Ct. 1745, 149 L.Ed.2d 668 (2001), the court analyzed the *Irvin* case, as follows:

> " 'In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.' [quoting *Irvin,* 366 U.S. at 722, 81 S.Ct. 1639] The relevant question, then, is whether the pretrial publicity 'so permeated the com-

munity as to render impossible the seating of an impartial jury."

. . . .

"[To invoke the *Irvin* ] doctrine requires a high threshold of proof that is reserved for extreme situations. Consequently, a mere finding of exposure to pretrial publicity is insufficient to overcome the jurors' assertions of impartiality.... 'They [*Irvin* and its progeny] cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.' To invoke the doctrine announced in *Irvin,* there must be a 'pattern of deep and bitter prejudice' or a 'wave of public passion' such that the seating of an impartial jury is impossible."

*Id.* at 107–08[17–18] (citations omitted except for *Irvin* ).

Contrary to Defendant's claim, there was not here a "pattern of deep and bitter prejudice" or "wave of public passion" that made the seating of an impartial jury impossible. Questionnaires sent to prospective jurors asked if they had heard about the case through the media or friends. Of the eighty-one prospective jurors summoned for this case, twenty-six answered this question affirmatively and were, therefore, questioned at length by the court and counsel concerning what they had heard. Those who remembered the case had only vague, general recollections that a man was accused of setting a woman on fire. Some did not even remember the correct circumstances as reported. Moreover, thirteen of those twenty-six were struck for cause by the court. Only five of the remaining thirteen potential jurors

who had some information regarding the case served on the petit jury.

Juror Morrison stated she received information from the newspaper and coworkers when the incident first occurred over one year prior. She further stated she did not remember any facts and had formed no opinions regarding the innocence or guilt of Defendant. Juror Brown stated she did not remember where she received pretrial information, but that it was probably from the newspaper. Moreover, she stated she had no opinion regarding the case because she only read the headlines. Juror Vance said she read about the case in the newspaper and heard about it on television, but "didn't pay much attention" to the case. She assured the court that whatever she had heard about the case, it had not caused her to have any opinion about Defendant's guilt or innocence. Juror Love said she did not remember much about the case because it had been a long time since she heard anything about it. The only thing she remembered was that a woman was set on fire and her limited knowledge had not led her to form any opinion about guilt or innocence. Juror Jenkins stated she had read something in the newspaper and heard something on TV about the case when the incident occurred, but hadn't read anything since then. She remembered the case involved liquid that was thrown and the victim was allegedly set on fire. She stated she could judge the case solely on the facts as adduced and the exhibits and the law as instructed by the court.

Therefore, the jury that convicted Defendant included five people who had heard "something" about the case, but did not remember any specific details.[12] The

---

**12.** Although not dispositive in an *Irvin* analysis, the fact that the five jurors who had heard about the case claimed to have no pre-conceived notions about guilt or innocence, dis-

other seven jurors had heard absolutely nothing about the case. "Of course there could be no constitutional infirmity in these rulings if [Defendant] actually received a trial by an impartial jury." *Beck v. Washington,* 369 U.S. 541, 556, 82 S.Ct. 955, 963, 8 L.Ed.2d 98 (1962). This is not the type of "extreme situation" which mandates a finding of presumptive prejudice.

 In reaching this conclusion, we have considered when the publicity occurred, whether the media accounts were primarily factual, and whether the publicity contained inflammatory, prejudicial information not admissible at trial. *See State v. Deck,* 994 S.W.2d 527, 533–34[7] (Mo.banc 1999), *cert. denied,* 528 U.S. 1009, 120 S.Ct. 508, 145 L.Ed.2d 393 (1999). In making that analysis we exhaustively examined the record provided by Defendant. It contains eleven newspaper articles regarding the case. Of those articles, nine appeared between the day after the incident (August 23, 1999) and September 18, 1999. All the articles were substantially factual in nature. Defendant's chief complaint with these articles was the fact that they mentioned prior domestic violence disputes between Victim and him. Defendant has never challenged that these factual allegations were untrue. Furthermore, most of the venire-persons did not even remember the allegations regarding domestic disputes between the two. The remaining two articles merely mentioned the case and the fact that Defendant renewed his request for a change of venue. Also in the media coverage was a segment on the "Montell Williams" show which has not been provided to this court. The final remaining issue was a local radio program that discussed the case which dealt primarily with the issue of domestic

violence in the county and most people who called in did not even mention the case.

The "high threshold" of proof needed to invoke the doctrine of presumptive prejudice has not been met here. Unlike *Irvin* and its progeny, this is not a case that was entirely lacking in the solemnity and sobriety to which Defendant was entitled in a system that demands due process and avoidance of mob rule. *See Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). The trial court did not err when it refused to invoke the doctrine of presumptive prejudice and overruled Defendant's motions seeking to have jurors from another venue try his case or for a continuance. Point IV is denied.

*Point V: Error in Overruling Motion to Suppress?*

Defendant alleges the trial court erred in denying his motion to suppress and admitting at trial over his objections certain alleged illegally obtained evidence. Specifically, Defendant "sought suppression of: (1) physical evidence seized after an initial warrantless search of his home and testimony related thereto; and (2) physical evidence seized from his home after issuance of an invalid search warrant and testimony related thereto." We find no merit in this point.

 In order to obtain reversal, Defendant must show the trial court's ruling on the motion to suppress was clearly erroneous. *State v. Wright,* 30 S.W.3d 906, 909[2] (Mo.App.2000). An appellate court reviews the court's findings to determine if they are supported by substantial evidence. *Id.* at 909. We view the facts and any reasonable inferences arising

---

tinguishes this case from *Irvin.* In *Irvin,* some prospective jurors had formed opinions that the accused was guilty because of what

they had heard, yet, each swore that despite those opinions they could render an impartial verdict. Those are not the facts of this case.

therefrom in the light most favorable to the trial court's ruling and disregard all contrary evidence and inferences. *Id.*

 When considering whether a warrantless search and seizure is reasonable under the Fourth Amendment, we must first determine if the police are lawfully in the place from which they seized the evidence. *State v. Johnston,* 957 S.W.2d 734, 742 (Mo.banc 1997). The police may enter a private home without a warrant when exigent circumstances compel them to do so. *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). "Exigent circumstances exist if the time required to obtain a warrant 'would endanger life, allow a suspect to escape, or risk the destruction of evidence because of an imminent police presence.'" *Wright,* 30 S.W.3d at 910[5] (citation omitted). Factors to be considered in making this determination include: (1) the gravity of the offense; (2) reasonable belief by the police the suspect is armed; (3) more than minimal probable cause to believe the suspect committed the crime; (4) strong reason to believe the suspect is in the premises in question; (5) likelihood of escape if prompt action is not taken; and (6) the entry is made peaceably. *State v. Alexander,* 729 S.W.2d 486, 488 (Mo.App.1987).

 There was ample evidence from which the trial court could reasonably infer exigent circumstances existed which justified the warrantless police entry into the home. Deputy Pounds ("Pounds") stated he had been to the home on prior occasions and knew Defendant resided there. Moreover, Victim was screaming, "He set me on fire. He burnt me[;]" and Pounds believed Victim was referring to Defendant. Pounds testified he entered the home initially "to check" because he was not sure where Defendant was and "what state of mind he was in," and due to the

large number of people at the scene, he wanted to secure the scene for "safety purposes." Furthermore, Pounds knew children were in the home due to his prior contacts. Pounds also testified this "search" was done only for protection purposes and involved no searching for evidence.

The heinous offense was committed against Defendant's live-in girlfriend who told Pounds that Defendant was the person responsible. The crime was committed next door to Defendant's residence, and it was reasonable to assume Defendant fled there. It was also reasonable to believe that if Defendant was willing to harm his girlfriend, he might be willing to harm other loved ones, such as his children. When requesting to enter the residence, Defendant's fifteen-year-old daughter consented to the entry. She told Pounds and his sergeant that Defendant was not in the house. However, this fact standing alone would not negate a reasonable belief Defendant was hiding therein and had told his daughter to lie to the police. In fact, the daughter admitted to lying to the police regarding other matters. Considering the nature of this atrocious crime, an eyewitness identification by Victim, the proximity of time and location to Defendant's residence, and the potential harm to police, children, and others, the police would have been wholly remiss in failing to conduct a cursory sweep for protection.

The evidence of which Defendant complains in this regard, i.e., blood spatters and a broken beer bottle, was in plain view and discovered by Pounds and another officer during a lawful protective sweep and could have been seized at that time. *See Johnston,* 957 S.W.2d at 744 n. 1. Moreover even if this were an illegal search, the evidence would have been seized inevitably through lawful means by either a search warrant or consent to

search given by Victim. *See State v. Jackson*, 756 S.W.2d 620, 622 (Mo.App.1988); *State v. Smith*, 735 S.W.2d 65 (Mo.App. 1987). Any alleged error regarding this evidence is without merit.

The second prong of Defendant's fifth point relates to a search warrant obtained by Detective Mark Hall ("Hall") which Defendant claims is not supported by probable cause. Defendant points to false information contained therein which he claims Hall made knowingly or in reckless disregard of the truth. This subpoint is also without merit.

 To successfully attack a search warrant on the basis of a misrepresentation, Defendant must make a substantial showing the affiant knowingly, intentionally, or with reckless disregard for the truth, included a false statement in the affidavit. *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978); *State v. Dawson*, 985 S.W.2d 941, 950[16] (Mo.App.1999). Furthermore, Defendant must show that without this false information, the remaining information was insufficient to establish probable cause. *Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674; *Dawson*, 985 S.W.2d at 950[17].

The evidence seized pursuant to the warrant obtained by Detective Mark Hall ("Hall") was the following: (1) a photograph of a container of lacquer thinner, (2) a photograph of a broken beer bottle and blood, (3) a container of lacquer thinner, and (4) the testimony of Hall that he saw these items in Defendant's home. Hall admitted at the suppression hearing that some of the averments in the affidavit were false. However, this alone did not automatically invalidate the warrant. Hall testified that the crime scene was "mass

hysteria," and he believed every statement contained in the warrant application was true. Even assuming Hall intentionally misled the court or made the averments in reckless disregard for the truth, we must still examine the remaining statements to determine if the warrant was supported by probable cause.

 In so doing, there was ample information contained therein establishing probable cause. Hall was an 18–year veteran of the police force. Hall saw the lacquer thinner, beer bottle, and traces of blood when he first arrived on the scene in plain view because the garage door was open and the light was on.[13] Hall knew this to be the home of Defendant and Victim, the two had been "fighting" in the garage, Victim suffered severe burns, and Victim stated Defendant was the assailant. In determining probable cause, the issuing judge looks to the totality of the circumstances "to make a practical, common sense decision whether ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). This standard has been met. Moreover, all of this evidence was viewed by two other officers during the protective sweep who could have seized the evidence at that time. *See Johnston*, 957 S.W.2d at 744 n. 1. Point denied.

*Point VI: Trial Court Rulings of Defendant's Motion In Limine*

Defendant's sixth and final point charges that the trial court committed reversible error by "ruling that [Defendant's] prior *city conviction* in 1993 for trespassing and related bad acts were admissible [and] in overruling objections by [Defendant] to

---

**13.** Defendant seems to argue that Hall should not have been believed because there was testimony from another officer that the light in the garage was off. This was a credibility determination for the trial court and will not be upset by this court.

such evidence." (Emphasis supplied.) To understand why this point preserves nothing for this court to review requires these background facts.

Defendant filed a motion in limine in which he asked the trial court to "exclude any evidence of [Defendant's] bad acts or municipal violations in either the State's case in chief or in cross-examination of defendant should he take the stand to testify in his own defense." As a pre-trial matter, the court asked the prosecutor if he conceded this motion. The prosecutor replied, "At this point I concede the motion." He immediately qualified that answer, however, by explaining that if Defendant presented evidence of his alleged diminished capacity or otherwise advanced a defense that he lacked the requisite mental state to be convicted of felonious assault, the prosecutor would then ask the court to reconsider whether Defendant's "in limine" motion should be sustained or overruled. Thereon, the trial judge ruled, "The motion in limine ... is granted for the moment[,]" but stated he might have to revisit the issue depending on what evidence was adduced at trial.

Not surprisingly, this "in limine" issue resurfaced. During defense counsel's cross-examination of detective Arnott, the prosecutor suggested to the trial judge that defense counsel had gotten into the issue of intent. Specifically, he argued defense counsel had framed his questions to police officers about Defendant's post-arrest statements so as to advance Defendant's theory that Victim set herself on fire, that Victim was accidently set on fire, or that Defendant never intended to cause Victim serious physical injury. With that as his premise, the prosecutor insisted the defense had opened the door for him to present rebuttal evidence of Defendant's prior bad acts toward Victim and his 1993 conviction for trespass.[14] To support his position, the prosecutor cited *State v. Smotherman*, 993 S.W.2d 525, 528 (Mo. App.1999) (holding courts often admit evidence of prior misconduct by an accused against the same victim in assault when the issue on which the evidence is offered relates to intent). At that point, the trial proceeded with no change in the court's ruling on the motion in limine.

Later, and just before the State rested, the trial judge ruled that his suspension of Defendant's motion in limine would remain in effect for the time being. The judge explained: "[W]hile the defendant may or may not testify, I have chosen to not lift the motion in limine but ... will analyze the defendant's ... case-in-chief and we'll have that information in hand before I make a final decision on whether I'll lift the motion for rebuttal."

After the State rested, Defendant called his daughter, Danielle, as his first witness. After Danielle testified, defense counsel addressed the trial judge as follows:

"Before we make a final decision on whether to put [Defendant] on the stand, it appeared that you might—we weren't sure ... but we thought you were inclined to let [the prosecutor] examine about the '93 incident if [Defendant] got on the stand and basically indicated that he didn't set her on fire. If that is the court's ruling, if it's not the

---

14. Although no offer of proof exists concerning Defendant's 1993 trespass conviction, we glean from the lawyers' colloquy that the facts associated with it were as follows: Defendant and Victim began arguing in public, Defendant called Victim a whore, and accused her of sleeping with someone other than him. After Victim went to a friend's home, Defendant reacted by going there, kicking in the door, entering the bathroom, and holding Victim's head under water.

court's ruling then we might make a different decision."

This prompted a colloquy between the trial judge, defense counsel, and prosecutor that fills fifteen transcript pages. When fairly summarized, the outcome of their discussion was an announcement by the trial judge that if Defendant presented additional evidence on the issue of his intent, either by his own testimony or via an expert, he (the judge) was "leaning toward letting [the prosecutor] bring in the '93 incident by independent evidence[ ]" by use of rebuttal witnesses. Near the end of their discussion, defense counsel asked:

"Q. [I]f we don't put on either [Defendant] or [the expert witness], would you permit [the prosecutor] to get into this other evidence?"

"A. THE COURT: Probably not."

"Q. [DEFENSE COUNSEL]: Not?"

"A. THE COURT: [I]f I have to just make it out of [Danielle's] testimony beyond what I heard in the case-in-chief, I don't think that would be enough to push it over the edge."

A recess was then taken to allow defense counsel to talk with Defendant. When court reconvened, they announced Defendant was resting; that neither Defendant nor his expert would testify.

 A motion in limine has the salutary purpose of pointing out to the court and to opposing counsel which anticipated evidence might be objectionable, *Gage v. Morse*, 933 S.W.2d 410, 418 (Mo.App.1996). Even so, "[a] ruling in limine is interlocutory only and is subject to change during the course of the trial." *State v. Purlee*, 839 S.W.2d 584, 592 (Mo.banc 1992). As such, "[t]he motion in limine, in and of itself, preserves nothing for appeal." *Id.* at 592[22]. Missouri courts strictly apply these principles based on the notion that trial judges should be given an opportunity to reconsider their prior rulings against the backdrop of the evidence actually adduced and in light of the circumstances that exist when the questioned evidence is actually proffered. *State v. Colenburg*, 773 S.W.2d 184, 189 (Mo.App.1989). *See* William A. Schroeder, 22 Missouri Practice: Missouri Evidence § 103.4 at 84 (1999).

Here, the trial court's rulings and announcements during trial regarding the questioned evidence were no more than extensions of the pre-trial motion in limine ruling and thus, were not final or conclusive of the matter. This follows because, after Danielle testified and the judge announced his "probable" ruling on the evidentiary issues posed by Defendant's motion in limine, Defendant made two strategic decisions, i.e., not to take the stand and not to call his expert witness. Thereon, the State opted not to offer rebuttal evidence about Defendant's prior bad acts or the related trespass conviction. Since the State never tried to present the questioned evidence, Defendant never had to object; consequently, the trial court never had a chance to rule on its admissibility against the backdrop of Defendant's and his expert's testimony or in light of other circumstances that might have existed had the State actually proffered the testimony. As the trial judge intimated during his colloquy with the respective lawyers, he could not make a reasoned and fully advised decision on admissibility of the bad conduct and trespass conviction evidence until he had either heard Defendant's evidence, or at a minimum, until an offer of proof was made regarding that evidence. Neither of those events occurred; consequently, the trial judge's rulings and comments were merely interlocutory and could not have constituted reversible error. *State v. Myszka*, 963 S.W.2d 19, 26 (Mo.App.1998); (*See* William A. Schroeder, 22 Missouri

Practice: Missouri Evidence § 103.4 at 82 n. 5 (1999)).

■ Defendant's real complaint appears to be that the trial court erroneously ruled his motion in limine and that such error "materially impacted his decision not to testify." Based on this reasoning, Defendant argues we must reverse his conviction. We disagree. Assuming *arguendo* that the trial court's in limine rulings were erroneous, they cannot, in this instance, constitute reversible error. Defendant and his lawyer simply made a strategic and justifiable decision not to testify based on the court's interlocutory rulings. *See State v. Johnson,* 901 S.W.2d 60, 62 (Mo.banc 1995). They were not, however, forced to make that decision as they had other options. *Id.* Because the court's rulings regarding Defendant's trespass conviction and related bad conduct were clearly *in limine,* and subject to change, Defendant could have testified, or called his expert witness, or both, and then sought a different ruling from the court if and when the prosecutor attempted to introduce the questioned evidence. *Id.* Moreover, if indeed Defendant and his lawyer were firm in their belief that the questioned evidence was inadmissible, they could have brought an appeal in the event such evidence had been admitted over their objection. *Id.*

■ Finally, to the extent Defendant's Point VI seeks reversal on the theory the trial court "overruled objections" to evidence actually proffered for admission into evidence, Defendant is in effect asking us to convict the trial court of an error it did not commit. This we will not do. *See*

*Mercantile Trust Co., NA v. Hardie,* 39 S.W.3d 907, 914; *Greene County v. Pennel,* 992 S.W.2d 258, 261 (Mo.App.1999). Appellate courts do not render advisory opinions or decide nonexistent issues. *In re Estate of Looney,* 975 S.W.2d 508, 519[29] (Mo.App.1998); *In re Marriage of DuBois,* 875 S.W.2d 223, 226[2] (Mo.App. 1994). For all the foregoing reasons, we refrain from deciding Point VI.[15]

The judgment of conviction and sentence are affirmed.

MONTGOMERY, J. and BARNEY, C.J. Concur.

---

**15.** We decline to give plain error review of Point VI per Rule 30.20 due to the lack of any offers of proof. In the colloquy with the trial judge, defense counsel talked only in hypothetical and general terms about Defendant's testimony and that of his expert. However, no offer of proof was made. The same situation attends as to the State's rebuttal evidence. Without offers of proof, any discussion of Defendant's Point VI argument would be merely advisory.